IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PHILLIP LAMAR BUSBY,

    Petitioner,                          No. CIV S-04-2000 FCD GGH P

    vs.

JOE McGRATH,

    Respondent.                   FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2001 conviction for robbery, assault with a semiautomatic firearm, being a felon in possession of a firearm and resisting arrest. Petitioner is serving a sentence of 45 years pursuant to the Three Strikes Law.

        This action is proceeding on the amended petition filed February 7, 2005, raising three claims of jury instruction error. After carefully considering the record, the court recommends that the petition be denied.

<u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

        The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. <u>Neelley v. Nagle</u>, 138 F.3d 917 (11th Cir.), citing <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S. Ct. 2059 (1997). The

1

AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

\\\\\

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

The California Court of Appeal was the last state court to issue a reasoned decision denying petitioner's claims. Respondent's Lodged Documents 4, 6. Accordingly, the court considers whether denial of the claims by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (when reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision).

<u>Factual Background</u>

The opinion of the California Court of Appeal contains a factual summary. After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

**Prosecution Case**

At 3:00 a.m. on September 18, 2000, Katoya Hargrove and Jason Paride, employees of the Sacramento 6 Drive-In Theater off Bradshaw Road in Sacramento County, were preparing to close for the night. Paride's friends Karl Hansen and Mike Power were there, waiting for Paride to finish. They were all inside a locked building which housed an office with two safes in it, a storage room a video game room, and a snack bar.

Paride unlocked a door of the building and headed outside to turn off the movie projectors, with Power behind him. Paride saw an African-American man facing away from him. The man turned toward him with a semiautomatic in his hand and ordered Paride and Power inside. They lay face down on the storage room floor. Two other men entered the building as the first man went through Paride's and Power's pockets and removed Power's wrist watch.

Hansen, playing a video game, heard someone yell "Let's go" and "want to get out of here." Looking up, he saw a tall husky male wearing baggy blue jeans, workman boots, and a puffy black jacket with a hood over his head; a mask covered the lower part of his face. Thinking the man was an employee, Hansen went back to his video game.

Hargrove, in the office, heard loud voices but did not suspect a problem. Then two African-American men, wearing hoods with their mouths covered and holding guns, entered the office and ordered Hargrove to open the safe. She said only Paride could open it. They ordered her to walk to the office entranceway and get down on the floor face first.

Paride was then forced at gunpoint to walk to the office with his head down. Hansen, looking up again, saw a man pushing Paride toward the office. Hansen, approximately 60 feet away, thought the man was about five feet eight inches tall with a slender muscular build and hair in cornrows; he was wearing a bright red baggy shirt and tan corduroy pants, and had no jacket or mask. [Footnote 2]

> [Footnote 2: According to the probation report, defendant is five feet nine inches tall and weighs 210 pounds.]

Hansen could not tell whether the man had a gun. Hargrove, also observing the the man, reckoned him to be a little smaller than the five-feet-seven-inch Paride; she also could not see whether he had a gun.

Hansen entered the storage room, where Power was on the floor. The tall man in the black jacket came in and ordered Hansen to the floor at gunpoint. The robber then held the gun to Hansen's head, took his wallet, cell phone, and pager, and ordered Hansen and Power not to move.

Meanwhile, Paride and the other robber entered the office; one of the robber's cohorts was already inside. The first robber went to the unlocked safe, which held about $14,000; he grabbed "stuff" and put it in a canvas bag. The other safe proved empty. A robber pulled gold chains off Paride's neck, forced him down at gunpoint, and asked where his cell phone was. The robber ordered Paride to

4

count to a thousand before moving.

After the building was quiet, Paride got up. His cell phone was missing and all the office phones were disabled. The victims locked the building and called the police at 3:30 a.m. by using the office fax machine and speaker phone.

Around the same time, California Highway Patrol Officer Richard Handwork and his partner were heading southbound on Highway 99 approaching 47th Avenue, a location less than 12 miles from the robbery scene. Officer Handwork spotted a white car and a black car ahead which were speeding, swerving back and forth between lanes, and cutting each other off.

Suspecting road rage, the officers followed the cars, which suddenly crossed several lanes of traffic to take the 47th Avenue exit. The cars stopped at a red light, with the black car in the turning lane and the white car heading straight. The officers followed the white car, which had appeared to be the aggressor on the freeway. After the light turned green, they stopped the white car.

Officer Handwork approached the car from the passenger side, where the window was rolled down. Defendant was alone inside, with a semiautomatic and a cell phone on the seat beside him. Handwork drew his firearm, told defendant to keep his hands up, and asked if the gun was loaded. Defendant began to swear and pound his fists on the steering wheel. Then he threw open the driver's door and simultaneously reached toward the passenger seat.

Officer Handwork fired once in defendant's direction. Defendant rushed out of the car, ran down the street toward an auto parts store, and vanished. Handwork contacted the dispatcher by radio at 3:36 a.m. and requested backup. He described defendant as five feet 10 inches tall with a medium build approximately 200 pounds, wearing a red shirt and blue jeans, with short hair (not cornrows).

Officers arrived and set up a perimeter around the area. A few hours later, when defendant appeared running near the auto parts store, the officers pursued and caught him. He was bleeding from a gunshot wound in the thigh. His shirtsleeves and the bottoms of his pants legs had been ripped off.

Searching defendant's car, the police found identification cards in the names of Phillip Busby and Latasha Busby. A black leather jacket was in the trunk. A photograph of the passenger seat introduced into evidence showed a gun and a cell phone. At trial, Paride identified the cell phone was his by the numerous customizing features he had put into it.

After defendant was taken to the hospital and then booked, he spoke to two detectives in a videotaped interview. [Footnote 3.] He said he had the gun because

   [Footnote 3: The tape was played for the jury, and a transcript was provided.]

he intended to kill himself. That was why he was "driving crazy" on the freeway, not because he was having problems with the black car. He could not remember much about the night before because he was drunk; he had had two 40-ounce

5

bottles of beer.  The cell phone in the car probably belonged to one of two women he had given a ride to, whose names he did not know.  One of the women had a "little brother" with her who was flashing large sums of money, "running off at the mouth," and carrying a gun.

**Defense Case**

Seven fingerprints were lifted from the robbery scene.  The parties stipulated that none was defendant's.

Defendant testified on his own behalf.  He admitted his story to the detectives was false in numerous respects: he lied when he told them he did not know anything about the black car, when he claimed he had the gun in order to kill himself, when he claimed he had a cousin who had killed himself, when he said he had met girls somewhere other than the Jack-in-the-Box, and when he said he drank a lot of alcohol that night but did not smoke marijuana.  However, he told a new story also designed to prove his innocence of robbery and assault. [Footnote 4.]

> [Footnote 4: Defense in closing argument conceded defendant's guilt on counts IX and X (felon in possession of firearm, resisting arrest).]

According to defendant, on the night of the robbery, after playing video games with friends he headed toward home.  On his way he bought a sandwich from a Jack-in-the-Box on Bradshaw Road near the Sacramento 6 Drive-In Theater.  The restaurant was busy and the parking lot was well lit.

Parking behind the restaurant to use the pay phone to call his wife, he saw a black Infiniti Q45 parked near the phone; a woman he recognized was in the driver's seat.  After hanging up her cell phone, she started talking to defendant and gave him her cell phone number.  Then three men appeared from the direction of the drive-in theater; one was large and wore a puffy black jacket.  The woman said she had to go.  The large man told her to get in the passenger seat; she did.  The other men got in the back.

Defendant went back to his car.  As the black car drove away, he spotted a cell phone on the ground.  Thinking it was the woman's phone, he picked it up and ran out into the street to flag down the black car, but the car made a U-turn past him and headed toward the freeway on-ramp.  Defendant jumped into his car, made the same U-turn, and got on the freeway.  He was speeding, but as he approached the black car it also started to speed.  When the cars pulled even, someone rolled down the passenger window in the black car; defendant held up the phone, but the passenger in back and the woman in front "waved [him] off."

The black car suddenly exited the freeway, and defendant followed.  At the red light, defendant and the woman spoke through rolled-down windows.  She denied the cell phone was hers.  A man in the black car said, "Get rid of the cell phone; going to get us caught up."  Just then, the officers stopped defendant.

Defendant denied acting erratically just after the stop or reaching toward the passenger seat.  He admitted lying to the police later about the cell phone, but said he did so because he knew "there is something with this phone," based on the

6

        black car's occupants' reaction and the detectives' questioning, and he did not want to be a snitch.

        On cross-examination, defendant reverted to his original story that he had met two girls and a "little dude" who was flashing cash at a parking lot that evening; however, it was not the Jack-in-the-Box lot. He could not recall anything about the appearance or dress of the three men he saw at the Jack-in-the-Box. He admitted that if they were the robbers, they parked their getaway car in a brightly lit parking lot with poor freeway access, even though other businesses closer to the drive-in theater were closed at that hour.

        **Rebuttal**

        Officer Handwork testified that when he was behind defendant and the black car at the red light, no one in the black car rolled down a window and no conversation between the cars occurred.

Respondent's Lodged Document No. 4, pp. 2-9.

Discussion

    *Legal Standard*

    A challenge to jury instructions does not generally state a federal constitutional claim. See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985). Habeas corpus is unavailable for alleged error in the interpretation or application of state law. Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1981); see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). The standard of review for a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)." Estelle v. McGuire, 502 U.S. at 68, 112 S. Ct. at 480. In order for error in the state trial proceedings to reach the level of a due process violation, the error had to be one involving "fundamental fairness." Id. at 73, 112 S. Ct. at 482. The Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly. Id. at 73, 112 S. Ct. at 482.

    The primary issue here involves the burden of proof for establishing a crime, and whether a jury instruction permitting an inference of guilt from circumstantial evidence relieved

the prosecution from proving every element of the crime beyond a reasonable doubt.  While at times, it is said that "every fact necessary to constitute the crime" must be proven beyond a reasonable doubt, In re Winship, 397 U.S.358, 364, 90 S. Ct. 1068 (1970), such is a shorthand way of saying that all factual *elements of the crime* must be proven beyond a reasonable doubt. See also Gibson v. Ortiz, 387 F.3d 812, 822 (9th Cir. 2004).  However, not every fact underlying the verdict must be proven beyond a reasonable doubt: "Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." Schad  v. Arizona, 501 U.S. 624, 632, 111 S. Ct. 2491, 2497 (1991).  Thus, although there must be a set of facts or circumstances which comprise an element of the crime which must be proven beyond a reasonable doubt, the jury does not have to agree on all facts and circumstances presented by the prosecution's evidence argued to show guilt (unless dictated by the particular criminal statute at issue).  Thus, for example, although the identity of the criminal must be proven beyond a reasonable doubt, not all have to agree that the defendant's testified to hairstyle is a fact which proves that identity beyond a reasonable doubt – some jurors may have a doubt about that, and believe that a referenced scar is better evidence.

*Claim One*

Petitioner alleges that CALJIC 2.15 violated his right to due process by permitting the jury to convict him of robbery if they found only *slight* corroborating evidence to add to the fact that petitioner was found in the possession of recently stolen property.

Respondent first argues that petitioner waived this claim because the amended petition contains no analysis or authority to support this claim.  While this is true, the merits of this claim were briefed in state court so that both parties are familiar with the legal issues.  The court does not find that petitioner's cursory briefing waives this claim.

CALJIC 2.15, as read in petitioner's case, provides,

> If you find that the defendant was in possession of recently stolen property, the fact of that possession is not by itself sufficient to permit an inference that the defendant is guilty of the crimes charged in Counts One through Eight.

> Before guilt may be inferred there must be corroborating evidence tending to prove the defendant's guilt; however, that corroborating evidence need only be slight and need not by itself be sufficient to warrant an inference of guilt.
>
> As corroboration, you may consider the attributes of possession, time, place, and manner that the defendant had an opportunity to commit the crime charged; the defendant's conduct in his false or contradictory statements, if any, and/or other statements...he may have made with reference to the property, a false account of how he acquired possession of the stolen property, or any other evidence which tends to connect the defendant with the crime charged.

Respondent's Lodged Document No. 4, pp. 9-10.

In particular, petitioner argues that use of the word "slight" in CALJIC 2.15 reduces the prosecutor's burden to prove guilt beyond a reasonable doubt. Petitioner contends that the jury could infer that he was guilty of robbery and assault based on corroborating evidence that need only be "slightly" proved rather than proved beyond a reasonable doubt. See Reply to Answer, p. 5.

The California Court of Appeal rejected this claim:

> Defendant contends CALJIC No. 2.15 violates federal constitutional due process because (1) it requires only "slight" corroborating evidence to prove guilt; (2) it permits an inference or presumption based on insufficient foundational facts; and (3) it fails to require that possession of stolen property be unexplained beyond a reasonable doubt before a jury may draw an inference adverse to the defendant. As defendant acknowledges, however, the California Supreme Court has expressly upheld CALJIC No. 2.15 against constitutional challenges of this sort. (People v. Mendoza (2000) 24 Cal.4th, 176-177; People v. Holt (1997)15 Cal.4th 619, 677; People v. Johnson (1993) 6 Cal.4th 1, 37, 38. We are not free to reconsider the constitutionality of the instruction. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.).
>
> Furthermore, as courts have often pointed out, and as they have specifically noted in response to the arguments defendant raises against CALJIC 2.15: "[I]nstructions are not considered in isolation. Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury." (People v. Holt, supra, 15 Cal.4th 619, 677.) The trial court properly instructed the jury that it should consider the instructions as a whole; that the prosecution had to prove guilt, including the identity of defendant as the person who committed the crimes, beyond a reasonable doubt; that in a case depending on circumstantial evidence (as here), before the jury could find an inference essential to establish guilt proved beyond a reasonable doubt, each fact or inference on which the inference necessarily rested must be proved beyond a reasonable doubt; and that the jury should disregard any instruction it found inapplicable to the facts. Given all these instructions, we must presume the jury understood and followed

(People v. Adcox (1988) 47 Cal.3d 207, 253), there is no possibility the jury could have interpreted CALJIC No. 2.15 so as to lessen the prosecution's burden of proof.

Respondent's Lodged Document 4, p. 11.

This court has reviewed the three California Supreme Court cases cited by the California Court of Appeal. While these cases address issues relating to CALJIC 2.15, they do not directly address the issue of whether the word "slight" reduces the prosecution's burden of proof. However, on April 21, 2003, five days after the California Court of Appeal filed its decision in petitioner's case, the California Supreme Court decided People v. Prieto, 30 Cal.4th 228, 248, 133 Cal.Rptr.2d 18, 35 (2003) which held that CALJIC 2.15 did not reduce the prosecution's burden of proof:

> Initially we reject defendant's contention that the trial court's instruction mandates reversal because it lowers the burden of proof. CALJIC 2.15 did not directly or indirectly address the burden of proof, and nothing in the instruction absolved the prosecution of its burden of establishing guilt beyond a reasonable doubt. Moreover, other instructions properly instructed the jury on its duty to weigh the evidence, what evidence it may consider, how to weigh that evidence, and the burden of proof. In light of these instructions, there is "no possibility" CALJIC 2.15 reduced the prosecutions's burden of proof in this case. (Barker, supra, 91 Cal.App.4th at p. 1177).

30 Cal.4th at 248, 133 Cal.Rptr.2d at 133.

While the California Supreme Court in Prieto did not expressly address the term "slight" corroborating evidence, it reviewed the entire instruction and found nothing in its language that lowered the government's burden of proof.

In the instant case, the jury was instructed to 1) consider the instructions as a whole, CT 139, CALJIC 1.01, 2) "before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt," CT 144, CALJIC 2.01; 3) "The burden is on the People to prove beyond a reasonable doubt that the defendant is the person who committed the crime with which he is charged." CT 161, CALJIC 2.91.

\\\\\

Reading CALJIC 2.15, together with the instructions set forth above, it is not reasonably likely that the jury believed that the corroborating evidence need only be slightly proved. Estelle, 502 U.S. at 72, 112 S.Ct. at 482 (in federal habeas, the court considers whether there is a "reasonable likelihood" that the jury applied the at-issue instruction in a way that violates the Constitution). Rather, the common sense reading of CALJIC 2.15, combined with the other instructions set forth above, was that the prosecution had to prove beyond a reasonable doubt some corroborating circumstances which tended to slightly corroborate the primary identity issue – possession of the stolen property.

Reaching the correct issue here, the undersigned is not as sanguine about the validity of CALJIC 2.15 as is the California Supreme Court. It may well be true in some cases that possession of the stolen property is so consistent with guilt that only a little bit of corroborating evidence need be produced to push the matter "over the top" as far as "identity beyond a reasonable doubt" goes. This case at bar is certainly such a case. In other cases, however, the mere possession of the stolen property may be much more problematic in its implications. Take for example, the same basic facts here, but that the stolen property was not found in the car, rather it was found later in the possession of the defendant's girlfriend at her apartment. Assume that the girlfriend was prosecuted along with the defendant. The hypothetical situation presents possible, legitimate "innocent" explanations for the girlfriend's possession of the stolen cell phone. Yet the jury would be instructed in her case that only "slight" corroboration would be needed to infer guilt because the cell phone was found in her possession; in the hypothetical situation, it would seemingly take more than "slight" corroboration before identity of her as a robber, or even as an accomplice to a robber, could be inferred beyond a reasonable doubt.

Also, the instruction here does not expressly advise the jury that it may disregard the inference. Rather the wording: "[b]efore guilt may be inferred" [slight corroborating evidence need be produced], connotes a permission to find guilt on slight evidence rather than

evidence based on the whole beyond a reasonable doubt.

On the other hand, the instruction does not require the jury to find guilt either. Because this is an AEDPA case, and the generalized Supreme Court prohibitions on mandatory presumptions are not completely apposite here, and because the instruction certainly fits the facts of the crime here without the problem seen by the undersigned, the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

*Claim Two*

Petitioner argues that there were not sufficient foundational facts to warrant giving CALJIC 2.15 as to the assault charge. The California Court of Appeal rejected this claim based on the same reasoning it denied claim one, as set forth above.

As stated above, five days after the California Court of Appeal issued its decision, the California Supreme Court decided Prieto. In Prieto, the California Supreme Court held that application of CALJIC 2.15 to non-theft offenses was improper:

> Nonetheless, we agree with defendant that the trial court's application of CALJIC 2.15 to nontheft offenses like rape or murder was erroneous. We have approved the use of CALJIC 2.15 with respect to theft offenses because, "[w]ith the inference from the knowledge and conscious possession of [stolen] property, and slight additional evidence as corroboration, the intent to steal, identity and the determination a defendant committed the acts necessary to constitute robbery and burglary have been found to naturally and logically flow..." (Barker, supra, 91 Cal.App.4th at p. 1176, fn 6, 111 Cal.Rptr.2d 403). The same is not true for nontheft offenses like rape or murder. As explained in Barker, "[p]roof a defendant was in conscious possession of recently stolen property simply does not lead naturally and logically to the conclusion the defendant committed" a rape or murder. (Id. at p. 1176, 111 Cal.Rptr.2d 403.) We therefore find the trial court's inclusion of nontheft offenses like rape and murder in CALJIC 2.15 erroneous.
>
> This error, however, was not prejudical because there was no reasonable likelihood the jury would have reached a different result if the court had limited the permissive inference described in CALJIC No. 2.15 to theft offenses. (See Watson, supra, 46 Cal.2d at p. 836, 299 P.2d 243.) Both surviving victims identified defendant on numerous occasions as the man who sexually assaulted and murdered Woodruff, and Sorian and Estrada as the men who raped them. Their unrebutted testimony also established that the murder was committed in the course of the robberies, kidnapping and rapes. Given this overwhelming evidence of defendant's guilt on the nontheft offenses, no prejudical error could have

occurred. (See <u>Barker</u>, <u>supra</u>, 91 Cal.App.4th at p. 1176, 111 Cal.Rptr.2d 402.) 30 Cal.4th at 248-249 133 Cal.Rptr.2d at 135-136.

As will be discussed below, the rationale applied in <u>Prieto</u> is similar to the standards used by federal courts in evaluating permissive inference jury instructions, like CALJIC 2.15. For this reason, this court finds that the California Court of Appeal did not reasonably apply clearly established Supreme Court authority in finding that the CALJIC 2.15 was appropriately applied to the assault charge. Accordingly, this court conducts a de novo review of this claim. See <u>Cooper-Smith v. Palmateer</u>, 397 F.3d 1236, 1243 (9th Cir. 2005).

CALJIC 2.15 is an inference instruction. In determining whether an instruction creates an impermissible evidentiary inference by relieving the prosecution of its burden to prove each element of a crime beyond a reasonable doubt, the court considers whether the instruction creates a mandatory presumption or a permissive inference. <u>United States v. Warren</u>, 25 F.3d 890, 897 (9th Cir. 1994). "A mandatory presumption tells the jury that it must presume that an element of a crime has been proven if the government proves certain predicate facts." <u>Id.</u> "[A] permissive inference instruction allows, but does not require, a jury to infer a specified conclusion if the government provides certain facts." <u>Id.</u> An instruction that creates a mandatory presumption violates due process because it "directly foreclose[s] independent jury consideration of whether the facts proved establish[] certain elements of [the charged offense]... and relieve[s] the State of its burden of... proving by evidence every essential element of [the] crime beyond a reasonable doubt." <u>Carella v. California</u>, 491 U.S. 263, 265-66, 109 S.Ct. 2419, 2420-2421 (1989).

Instructions creating permissive inferences, like CALJIC 2.15, do not shift the burden but violate due process unless it can be said "with substantial assurance" that the inferred fact is "more likely than not to flow from the proved fact on which it is made to depend." <u>Leary v. United States</u>, 395 U.S. 6, 36, 89 S.Ct. 1532, 1548 (1969)). Courts "determine the constitutionality of a permissive inference instruction on a case-by-case basis" by reviewing the

record evidence to see if the court can say with substantial assurance that the inferred fact flows more probably than not from the facts proven in the particular case.  See Warren, 25 F.3d at 898.

Although a presumption relieving the prosecution of its burden of proof as to an element of the offense is a structural defect, where the presumed fact is not an element of the offense, the error is reviewed for harmlessness.  United States v. Trevino, 419 F.3d 896, 903 (9th Cir. 2005).

Permissive inference instructions generally are disfavored because they tend to take the focus away from the elements that must be proved.  See Hanna v. Riveland, 87 F.3d 1034, 1037 (9th Cir. 1996) (instruction that person is speeding "may be inferred to have driven in a reckless manner" creates a permissive inference).  Such instructions are less objectionable if other instructions condition, qualify or explain them.  Id. at 1038.  However, a passing reference in the instructions to "consider all evidence" will not cure a defect where a jury is entitled to convict by focusing on a few isolated facts.  Id.

Based on the reasoning of the California Supreme Court in Prieto, supra, this court finds that it cannot be said with substantial assurance that the inferred fact, i.e. that petitioner committed the assault with the firearm, is more likely than not to flow from his possession of the stolen cell phone.  However, for the following reasons, this error was harmless.

"[E]rrors are harmless if they do not have a 'substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 622, 113 S.Ct. 1710, 1713 (1993).  In the instant case, no direct evidence linked defendant to the assault.  However, the jury found petitioner guilty of robbery.  The assaults were committed in the course of the robbery.  Having found petitioner guilty of robbery, it was not unreasonable for the jury to find that petitioner was guilty of the assault.

In the traverse, petitioner argues that even if petitioner was an accomplice to the robberies, the evidence did not necessarily make him an accomplice to the assaults.  The court disagrees.  Although the victims' memories were not entirely clear, evidence was presented that

14

all three robbers had guns.  Moreover, the guns were used to facilitate the robbery.  Therefore, even if one robber did not have a gun, he acted as an accomplice to the other robbers who did.

Accordingly, the court finds that the application of CALJIC 2.15 to the assault charge did not have a substantial and injurious effect or influence in determining the jury's verdict.

Having conducted a de novo review of this claim, the court finds that it is without merit.  Accordingly, claim two should be denied.

*Claim Three*

Petitioner argues that the trial court violated due process by failing to instruct the jury that in order to infer guilt from petitioner's possession of the cell phone, petitioner's possession of the cell phone must be unexplained [by a reasonable possibility of innocent possession].

Under California law, "where the evidence relating to 'possession' [of recently stolen property] is conflicting or unclear, an unqualified instruction pursuant to CALJIC 2.15 should not be given, for it could easily mislead the jury into assuming that the defendant's possession has been established when, in actuality, the issue is in doubt." People v. Morris, 46 Cal.3d 1, 40, 249 Cal.Rptr. 119, 114 (1988), overruled on other grounds, In re Sassounian, 9 Cal.4th 535, 545 n. 6, 37 Cal.Rptr.2d 446 (1995).  In Morris, the California Supreme Court found insufficient evidence to warrant the giving of CALJIC 2.15 when the only indication that the defendant possessed stolen property was the testimony of one witness who stated the defendant had presented a credit card that had been stolen from the victim.  The California Supreme Court also held that there was no likelihood that the jury was misled, because other instructions cautioned the jurors that they should disregard any instruction that applied to a state of facts they determined did not exist.  46 Cal.3d at 40-41, 249 Cal.Rptr. at 144-145.

In the instant case, the California Court of Appeal rejected this claim finding that there was sufficient evidence that the cell phone was stolen to warrant reading CALJIC 2.15:

> In addition, defendant contends the trial court should not have given CALJIC 2.15 because insufficient evidence supported it. We disagree.
>
> Defendant points out that his appearance and dress did not exactly match the victims' descriptions of how any of the robbers looked. He also asserts that his presence where the officers stopped him "was explained by his nearby residence," his flight from the officers "was explained by his awareness that his parole status made the gun in his possession a serious problem," and his "explanation for carrying a gun was reasonable, given his lifestyle." These points do not establish that it was error to give CALJIC 2.15.
>
> Defendant was caught red handed with Paride's cell phone in his car at a time and place which made it likely he acquired the phone in the robbery and highly unlikely he could have acquired it any other way. He explained his possession of the phone to detectives with an implausible story he admitted at trial was untrue, then told a totally different and equally farfetched story on the witness stand. Furthermore, Paride pointed out the special features he had incorporated into the phone when he identified at trial, and the defense did not challenge the identification; thus, neither of defendant's stories claiming the phone belonged to an unidentified woman could possibly have been true. The discrepancies between defendant's appearance and dress and the victims' accounts of the robbers' appearance and dress are immaterial, as the prosecution did not try to prove its case by eyewitness identification. Finally, CALJIC 2.15 did not tell the jury it could not consider defendant's explanations for his conduct–it merely told the jury to weigh them along with the other evidence on those points.

Respondent's Lodged Document No. 4, pp. 12-13.

This court agrees with the reasoning of the California Court of Appeal that petitioner's possession of the cell phone was sufficiently unexplained to warrant the reading of CALJIC 2.15. Because there was sufficient evidence that the cell phone was stolen property, with no reasonable possibility of innocent acquisition, no further instructions were required. In addition, the jury was instructed that it should disregard any instruction which applied to facts determined by the jury not to exist. CT 184, CALJIC 17.31. For these reasons, no violation of fundamental fairness occurred. Petitioner's due process claim is without merit.

The finding by the California Court of Appeal that the trial court did not violate due process by failing to instruct the jury that petitioner's possession of the cell phone had to be unexplained was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

\\\\\

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 03/03/08

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

busby.157